**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8              UNITED STATES DISTRICT COURT
9             NORTHERN DISTRICT OF CALIFORNIA
10
11    RANDY O FECHTIG,                          No. C 03-4056 JL
12              Plaintiff,
13        v.                            **FINDINGS OF FACT AND
                                        CONCLUSIONS OF LAW
                                        FOLLOWING BENCH TRIAL**
14    SEA PACIFIC INCORPORATED, ET AL.,
15              Defendants.
      _____/
16
                              **Introduction**
17
         In his summation, counsel for the Plaintiff candidly admitted that his entire case rests
18
on the credibility of the Plaintiff.  Unfortunately, as plausible as his version may be, the
19
defense has completely dismantled it.
20
         Plaintiff is the only witness who says he fell on deck. He is the only witness who
21
says the vessel's winch jerked and jammed before he fell. His testimony is inconsistent.
22
His memory is faulty.
23
         Defendants presented credible witnesses who testified that Plaintiff didn't fall, when
24
they were on deck with him and Plaintiff said they saw him. The same witnesses testified
25
that the winch jammed two weeks *after* Plaintiff was injured and the crew hammered on it,
26
but it didn't start. They used another winch for a while, then they restarted the first winch
27
and it worked fine for a another year and a half. These witnesses were credible. They didn't
28

have a personal stake in the outcome of this lawsuit and their stories have been consistent over time.

Plaintiff's expert has some practical experience but minimal expertise about winches. He based his conclusions mostly on Plaintiff's version of events. He never saw the Defendants' winch and his testimony conflicted with that of Defendants' expert.

Defendants' expert has impressive credentials and a long career inspecting, analyzing, overhauling and using hundreds of winches. He saw the Defendants' winch, identified it, obtained the specs from the manufacturer and based his conclusions on those specs, the testimony of a number of witnesses and his own vast experience and knowledge. He concluded that the alleged accident could not have happened the way Plaintiff described it.

The Court concludes that what Plaintiff claims happened didn't happen. Maybe he fell, and maybe he fell on the deck of the F/V Sea Clipper, but if so his fall was not due to any problem with the winch or any other negligence or unseaworthiness identified at the trial.

The Court also finds that Defendants paid Plaintiff maintenance and cure as soon as possible after he notified them of his claim and probably overpaid him by $2,000.

The Court finds for Defendants and concludes that Plaintiff has not met his burden of proof under the Jones Act or the doctrine of unseaworthiness.

### Procedural Background

In his complaint, filed September 5, 2003, Plaintiff alleges that on or about June 28, 2002, he sustained injuries to his back, right hip, left shoulder and cervical spine while employed by Defendants as a member of the crew of the F/V Sea Clipper.

Defendants allege that the F/V Sea Clipper was at all relevant times owned by Defendant Sea Pacific, Inc.  All of the Defendants deny negligence or liability in any way and deny that the vessel was unseaworthy.

This case was assigned at filing to the district court (Hon. Saundra Brown Armstrong). On January 8, 2004 all parties consented to the jurisdiction of this Court, as

1  provided by 28 U.S.C. §636(c) and Civil Local Rule 73. The case was reassigned and the

2  first case management conference before this Court was held February 25, 2004.

3       The parties pursued private arbitration and Plaintiff dismissed individual Defendant

4  Eugene Clahan.

5       On June 30, 2004 the parties appeared for a further case management conference

6  and were referred to a magistrate judge (Hon. Bernard Zimmerman) for a settlement

7  conference and dates were set for pretrial proceedings and trial.

8       On July 12, 2004, Plaintiff dismissed his Second and Third causes of action.

9       The settlement conference was held on November 18, the case did not settle at that

10  time and a further case management conference was held on December 15.

11       In February 2005 another case management conference was held and Plaintiff hired

12  new counsel. His new counsel, Edward M. Bull III, on March 3, 2005 waived his client's

13  right to jury trial and stipulated to a bench trial.

14       On April 29, 2005 the Court signed the parties' stipulation and proposed order

15  continuing the trial to June 20, 2005. The Court later granted the parties' request for a

16  further continuance of the trial to September 19, 2005, along with new pretrial dates.

17       The parties submitted a number of motions in limine. The Court held a pretrial

18  conference on September 15 at which it ascertained that the parties had not completed

19  discovery. The Court vacated the trial date, scheduled a further case management

20  conference for September 21 and re-set the trial for November 28.

21       The Court conducted a six-day bench trial beginning November 28, 2005 and

22  concluding December 6. Counsel argued, witnesses testified in person or by deposition,

23  and exhibits were received in evidence. Counsel filed proposed findings of fact and

24  conclusions of law on January 20, 2006. The Court ordered the parties to supplement their

25  proposed findings and conclusions with citations to the record. The parties obtained a trial

26  transcript and filed their findings and conclusions with citations on July 28, 2006. The

27  matter was submitted.

28

**United States District Court**
For the Northern District of California

1

## PARTIES' STIPULATED FINDINGS OF FACT

2  **Agreed Facts**

3        Plaintiff was born on July 15, 1965, and graduated from Walnut High School in

4  Walnut, California in 1983. Plaintiff thereafter worked in the construction and electrical

5  trades for approximately ten years. In about 1993, Plaintiff moved to Crescent City,

6  California to be close to his mother and grandmother and worked for several years as a

7  cook. Plaintiff remains a resident of Crescent City to this day. Plaintiff is divorced and has a

8  dependent son of five years of age.

9        The F/V Sea Clipper is a fishing vessel (hereinafter "F/V Sea Clipper").

10        In 2002, the F/V Sea Clipper was owned by Sea Pacific, Inc.

11        Defendant Sea Pacific, Inc. is a California Corporation with its principal place of

12  business in San Francisco.

13        Sea Pacific's primary shareholder, Mr. Eugene Clahan, was originally named as a

14  Defendant, but was later dismissed.

15        Beginning in about 1996, Plaintiff took his first job as a commercial fisherman.

16  Plaintiff worked part time as a fisherman and did odd jobs until 2002, when he joined F/V

17  Sea Clipper.

18        At the time of his alleged accident Plaintiff had been employed as a deckhand

19  aboard the F/V Sea Clipper since February 12, 2002 in the bottom fishing and hake

20  seasons. The F/V Sea Clipper had been involved in "bottom fishing" until late May of that

21  year. At the end of May 2002, the F/V Sea Clipper converted to fishing for pacific whiting,

22  otherwise known as hake, and Plaintiff continued to work as a deckhand during the new

23  season. Hake or "whiting" is a type of seasonal mid-water fish (i.e. it can be fished only

24  during certain times of the year).

25        Hake fishing is performed in a series of one or two day "derby runs," in which the

26  vessels motor to the fishery, set their nets and haul in fish until their fish holds are full or the

27  vessel is scheduled to return to the processor. The vessel then returns to port for

28  unloading, and then sails back to the fishing grounds.

**United States District Court**
For the Northern District of California

1    The F/V Sea Clipper fished in the 2002 hake season, which ran from June 15 to July

2  18, 2002.

3    For the 2002 hake season, the F/V Sea Clipper's crew consisted of Captain Mark

4  Gentry and generally two deckhands. The crew never consisted of more than two

5  deckhands at one time.

6    From approximately June 20 to June 25, 2002 the deckhands were Ody Richcreek

7  and the Plaintiff. From approximately June 26 to June 29, 2002 the deckhands were Kent

8  Mooreland and the Plaintiff. On June 30, 2002 and July 1, 2002, Kent Mooreland served as

9  the only deckhand on the F/V Sea Clipper. The Plaintiff served as one of the deckhands on

10  the F/V Sea Clipper from approximately July 2, 2002 to July 18, 2002.

11    The F/V Sea Clipper's trawling operation worked as follows. Upon arriving at the

12  fishing grounds, the crew released the "trawl net" from a roller into the water behind the

13  vessel. The forward end of the trawl net is open and the cod end (aft end) was tied tight.

14  Two wires ran from the opposite sides of the net to two "doors" (heavy rudder-like angled

15  metal pieces) which were also lowered into the water to spread the forward end of the net

16  as it is towed behind the vessel.

17    When the net was full, the crew pulled in the net to discharge its contents into the

18  fish holds. The deckhands used two main "warp winches" to retrieve the doors and lift them

19  to stern port and starboard blocks at the vessel's stern. When the doors had been lifted

20  from the water, the deckhands disconnected the wires securing the net to the doors, and

21  re-connected them to a main "retrieval wire" which ran forward to a net reel drum ("forward

22  net reel drum"). The forward net reel drum was located in the forward one-third and center

23  section of the F/V Sea Clipper's main deck. When the retrieval wire was connected, the

24  captain engaged the forward net reel drum to pull in the net to the point where the most

25  forward cod end of the net, the part of the net containing the fish, was on the F/V Sea

26  Clipper's ramp. The ramp was located aft and center of the F/V Sea Clipper's main deck.

27    The tension created by the net of fish also caused the part of the net between the

28  ramp and the forward net reel drum to spread fully open. When the net was fully spread,

there was a gap of approximately 1 foot between either side of the net and the divider boards.

The divider boards, which are approximately 3 feet high, were located port and starboard of the center line of the deck and run from approximately aft of the F/V Sea Clipper to approximately several feet before the forward net reel drum. The divider boards contained the fish as they were released from the trawl net into the fish holds. The fish holds were located between the divider boards.

After the most forward cod end of the net, the part of the net containing the fish, was on the F/V Sea Clipper's ramp, the deckhand working on the starboard side stepped over the divider boards and either into the space between the net and the divider board or onto the net. The deckhand then made the hook fast to a splitting strap on the net. The hook was connected to a block from which the "lift wire" ran through.

The lift wire was controlled by a winch located just aft of the wheel house ("lift winch") and operated by Captain Gentry. The lift wire ran from that winch to a block suspended from the forward A-frame down and back to the aft A-frame (where it is tied off when the net is in the water).

After the lift wire was made fast to the net, Captain Gentry, working from his position at the winch controls aft and starboard of the wheelhouse, engaged the winch to lift the net and pulled it forward to a position over the fish holds. The deckhand then pulled a "zipper line" (or splitting strap) on the bottom of the net, which opened the net to discharge the fish into the hold. The purpose of the zipper line was to allow sections of the net to be discharged in sequence. The process of pulling the net forward and releasing the zipper line continued until all sections of the net were unloaded.

During this operation, the second deckhand was positioned on the port side. His duties included observing the operation, making sure that the hook line did not interfere with the other deckhand's work, and hosing the fish out of the net and into the hold.

**United States District Court**
For the Northern District of California

1   The Plaintiff claims that the "accident" occurred after Captain Gentry had pulled up

2   the most forward cod end of the net onto the F/V Sea Clipper's ramp and prior to the crew

3   making its first lift of the trawl net full of hake.

4   The Plaintiff testified that he was facing aft while standing on the aft deck of the F/V

5   Sea Clipper, forward of the ramp, and between the divider boards. According to the

6   Plaintiff, he then attempted to hook the block to a splitting strap when Captain Gentry

7   instructed him to hook the block to a forward splitting strap (towards the forward part of the

8   F/V Sea Clipper).

9   According to the Plaintiff, as he was standing on the deck between the divider

10  boards holding onto the block and while his hands were approximately between his waist

11  and his shoulder, the line running from the lift winch to the block suddenly pulled and jerked

12  him off his feet and backward onto his left shoulder and back. The Plaintiff testified that his

13  back hit the deck of the F/V Sea Clipper inboard of the divider boards. According to the

14  Plaintiff, after he fell, he looked down and observed that his left shoulder landed on a steel

15  hammer lock. If the winch had been engaged to pull in the net when Plaintiff was standing

16  as he claimed, the cable and the hook in his hands would have moved up and backward

17  (toward the front of the boat).

18  Splitting straps are located at approximately 12 foot intervals on the trawl net.

19  Hammer locks are steel horseshoe shaped pieces of coupling that connect together at the

20  open end. Hammer locks are located next to the splitting straps and at 12 foot intervals on

21  the trawl net.

22  At the time of, the alleged accident Plaintiff was approximately 6'2" tall and weighed

23  approximately 220 pounds.

24  Despite the fall, Plaintiff continued working that day and the next morning without

25  comment or complaint. He didn't mention any problem with his shoulder until the next

26  afternoon, when he dropped about 30-40 feet of ¾ inch wire into the water as he was

27  attempting to transfer it from the trawl door to the net. When Captain Gentry asked the

28  Plaintiff why he dropped the wire, the Plaintiff explained that he had hurt his shoulder in a

fall he suffered on deck the day before.

United States District Court

For the Northern District of California

1    After the vessel returned to port on June 29, Mr. Fechtig sought, and Captain Gentry

2 approved, a medical exam for him at the Columbia Memorial Hospital in Astoria, Oregon.

3 The medical report states that he was injured when he fell on the deck of the boat while he

4 was "pulling a line - lost balance [and] fell on his left scapular. " His chief complaints were of

5 pain in the left scapular region and left low back. He also reported crunching in his left

6 shoulder. Examination revealed swelling in the apex of the left shoulder and with bruising

7 over the left scapula. The doctors diagnosed the Plaintiff with a "contusion of the left

8 shoulder and low back secondary to work related injury." Diagnostic imaging studies of the

9 left shoulder, scapula or sacroiliac joints were all negative. The Plaintiff declined pain

10 medication. On July 1, Doctor Zagata performed a follow-up exam. Dr. Zagata released the

11 Plaintiff back to light duty work after noting that he was "ambulating without difficulty" with

12 "good range of motion about the left shoulder."

13    The Plaintiff returned to work throughout the rest of the hake season and performed

14 his strenuous deckhand duties. Plaintiff worked as the only deckhand for the July 11 run

15 and the July 16-17 run, when the vessel landed one of its highest fish catches of the

16 season.

17                              **Facts in Dispute**

18 **The Winch**

19 **Plaintiff's argument**

20    Plaintiff contends that at the time of the accident, because of the design (rigging or

21 defect) of the winch, the responsible crewman had to maintain constant tension on the

22 cable (applying approximately fifty pounds of force) while maneuvering and rigging the hook

23 to the net.  Captain Gentry did admit that the crew would have to keep approximately 50

24 pounds of force on the hook, cable and winch. Gentry TT 634:6-19. He also admitted that

25 the winch stopped working for part of a trip and that the crew had to bang on it with a

26 hammer. Gentry Trial Transcript ("TT") 588:22-589:15 & 589:25-590:4.

27    According to the crew member witnesses, it was necessary to maintain constant

28 tension on the hook line attached to this winch to prevent the cable from becoming loose

1   and potentially overriding, binding and/or backlashing. Fechtig TT 161:13-162:18 & 163:5-

2   12; Gentry TT 634:6-19. See also the testimony of Charles Walther ("Walther"), TT 419:13-

3   18 & 422:2- 425:19 [admitting could cause "bird nesting" and line reversal.

4       Plaintiff contends that the winch used to lift the net not only required constant

5   tension but often backlashed or stopped working altogether.  Prior to his injury, whenever

6   the winch stopped altogether, the Captain and crew had to bang on the winch with

7   hammers to break free whatever was jamming it internally. The winch stopped working

8   altogether at one point during the 2002 hake season and Captain Gentry and the crew

9   banged on it with a hammer to try to free it up. Fechtig TT 172:18-173:18 & 176:20-177:21.

10      At trial Captain Gentry admitted that following the season in question the winch was

11  removed from the boat and was to be overhauled. Gentry TT 638:20-639:9. Although this

12  work was never done (when the winch was replaced with a new and larger winch), one item

13  that was identified as needing repair was the winch brake system. Testimony of Warren

14  Junes ("Junes") Deposition Transcript ("DT") at 24:8-18 ( Mr. Junes appeared at trial via

15  deposition and his testimony was not reported, his transcript having been lodged with the

16  Court, and then admitted into evidence as Court Exhibit 2). References are therefore to his

17  deposition of October 6, 2005. According to Junes, the faulty brake could both cause the

18  winch to seize up and to slip (though, according to him, it could only slip with thousands of

19  pounds of pressure being applied). Junes, DT 25:13-27:7; 50:15-20)

20  **Defendants' argument**

21      Defendants contend that although there was a problem with the hydraulics which ran

22  the winch two weeks *after* the accident, Captain Gentry and Mr. Mooreland agree that there

23  was no problem with the winch before or at the time of the accident. [Gentry TT 529:15-

24  530:17; Mooreland Deposition Transcript ("DT") 17:11-25:17, on video at Ex. UUU,

25  transcript admitted into evidence as Court Exhibit 5 . Captain Gentry further testified that

26  there wasn't a problem with the wire "birdsnesting" before or at the time of the accident

27  Gentry TT 588:5-19 Defendants' expert, Mr. Walther, also testified that a hydraulic problem

28

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1  would not cause the winch to stick or jerk, but would merely affect its speed.   Walther TT

2  374:5-375:19.

3        Captain Gentry testified that the winch did not cause the wire to jerk either.  On one

4  occasion during the season, the winch froze and had to be turned off.  When it was turned

5  back on, it worked again through the rest of that season and for another year later.  Gentry

6  TT 588:20-590:15.  Mr. Walther testified that this was likely due to dirt in the hydraulic

7  system release valve, which would divert hydraulic oil from the winch control and stop it

8  from moving.  After the system cooled and the release valve closed, the system would

9  operate properly. Walther TT 395:6-396:21.

10                                    **The Accident**

11  **Plaintiff's argument**

12        Captain Gentry admitted that he would most likely have been operating the winch

13  from the lower deck in an area located behind the forward net reel and the starboard trawl

14  winch. Gentry, TT 578:3-19 & 579:22-581:12. While he testified that he believed he would

15  have been leaning out (with his arm extended behind him), and thus would have had a

16  clear view of the accident scene, actual photographs taken by the defense show him to be

17  well behind the deck equipment in order to access the controls. See Defense Exhibit B-06.

18  These photographs also make it clear that at times the area of the accident (directly

19  forward of the ramp and between the trawl boards), would be obscured by the net reel. See

20  Plaintiff's Exhibit 5 and Defendants' Exhibits B-06, B-07 & B-08. See also Fechtig's

21  testimony regarding Gentry's many duties while he would have been hooking up the line.

22  Fechtig, TT 167:5-168:2.

23        The Plaintiff testified that he never considered reporting the event in question as an

24  "accident." Fechtig, TT 198:11-199:25. He assumed that he had simply bruised and/or

25  sprained his back and shoulder and that his pain would subside if he kept working. *Id.*

26  However, as he continued to work the day after the accident and his left shoulder pain

27  persisted, it is undisputed that the Plaintiff did report to Captain Gentry that he had injured

28  his shoulder when he fell on deck the previous day. Fechtig, TT 200:5-202:10 & 203:23-

United States District Court
For the Northern District of California

1   204:15. Gentry, TT 594:15-595:10. It is also undisputed that the Plaintiff requested and

2   received medical attention for his shoulder injury immediately upon reaching port and that

3   Gentry was aware of this medical visit. Gentry, TT 596:22-597:1.

4       Gentry admitted at trial that the Plaintiff did report falling on the deck and that he

5   sent an e-mail to the vessel owners on August 13, 2002, reporting the Plaintiff's incident

6   (that the Plaintiff reported that he "had taken a fall on deck"). See Plaintiff's Trial Exhibit No.

7   22. Although the e-mail referenced the accident as having occurred on July 29, 2002

8   (rather than on June 28), Gentry's Trawl Logbook contains notations in his own hand

9   writing that he learned of the incident on June 29. See Defense Exhibit D.

10  **Defendants' argument**

11      Defendants claim that while Plaintiff alleges that the accident occurred as he was

12  standing on the deck on the stern end of the F/V Sea Clipper attempting to hook the lift wire

13  and block to a splitting strap, Plaintiff's story is flatly contradicted by Captain Gentry and

14  deckhand Mooreland.  Although the Plaintiff testified on direct examination that he didn't

15  know if anyone saw him fall, Fechtig TT 197:22-198:23, he testified at deposition that he

16  didn't report the accident that day because Captain Gentry and Mr. Mooreland saw him fall.

17  Fechtig TT 456:17-457:21.

18      Captain Gentry and Kent Mooreland testified, however, that they did not see Plaintiff

19  fall, nor did he complain of hurting his shoulder until the next day. Gentry TT 575:11-20;

20  587:7-18; 594:15-595:21; Mooreland TT 33:11-38:3.  Captain Gentry testified that he was

21  supervising the net hauling operation and would have seen the Plaintiff fall had the accident

22  happened as he claims. Gentry TT 586:6-587:6.  Mr. Mooreland testified that during this

23  operation, his role was generally to observe the other deckhand and assist as necessary.

24  Mooreland DT 31:21-33:10.

25

26  **Plaintiff's previous injuries**

27  **Plaintiff's argument**

28

**United States District Court**
For the Northern District of California

1   Dr. Sampson specifically addressed the three documented prior complaints of

2   Plaintiff's shoulder pain and testified that the fact that they were passing in nature ruled

3   them out as having any connection to the condition requiring the surgery. Sampson, TT

4   30:19-31:8. Dr. Sampson also addressed the fact that the Plaintiff was able to move some

5   furniture and a lawn mower shortly before his surgery. He testified that the lifting in question

6   (with the Plaintiff using his arms in an extended "traction" position) was not inconsistent

7   with the Plaintiff's complaints of pain and, indeed, that it would actually tend to relieve his

8   pain by taking the pressure off the joint and relieving the impingement. Sampson, TT 28:22-

9   29:18 & 30:6-18.

10  **Defendants' argument**

11  Defendants claim that Plaintiff's medical records show that his need for medical

12  attention had nothing to do with this supposed accident.  Plaintiff's medical records reflect

13  that he had  problems with his shoulder long before his accident due to years of heavy work

14  and prior non work-related accidents.  His need for treatment was just another exacerbation

15  of a long history of pre-existing shoulder problems.  (See Defendants' Exhibits A, BB, HH)

16  <center>**Legal Issues in Dispute**</center>

17  **Whether Defendants were negligent (Jones Act Negligence)**

18  **Legal standard:**

19  The Jones Act provides a federal cause of action for "any seaman who shall suffer

20  personal injury in the course of his employment." See 46 U.S.C.App. § 688(a). "The

21  employer of a seaman owes the seaman a duty under the Jones Act to provide the seaman

22  with a safe place to work." *Ribitzki v. Canmar Reading & Bates, Ltd. Partnership*, 111 F.3d

23  658, 662 (9th Cir.1997). To recover under the Jones Act, a Plaintiff must prove that the

24  Defendant was "negligent and that this negligence was a cause, however slight, of his

25  injuries." *Id.* "The quantum of evidence necessary to support a finding of Jones Act

26  negligence is less than that required for common law negligence, ... and even the slightest

27  negligence is sufficient to sustain a finding of liability." *Id.* Thus, "a seaman must

28  demonstrate only that his employer's negligence played any part, even the slightest, in

producing his injury." *Id.* Nevertheless, "an employer is only liable under the Jones Act if the employer or its agent either knew or should have known of the dangerous condition "that contributed to the Plaintiff's injury. *Id.* at 663.

The elements of a Jones Act negligence claim are: duty, breach, notice and causation.  The only difference between Jones Act negligence and common law negligence is the test for causation.  The test for causation, which is often described as a "featherweight" causation standard, is whether the proofs justify that the employer's negligence played any part, even the slightest, in producing the injury for which Plaintiff seeks damages.

**Whether the F/V Sea Clipper was unseaworthy**

**Legal Standard:**

"Liability based upon unseaworthiness is wholly distinct from liability based upon negligence." *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 498 (1971). "A shipowner has an absolute duty to furnish a seaworthy ship," a ship "reasonably fit for its intended use." *Ribitzki*, 111 F.3d at 664. "The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service." *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550 (1960). "A vessel's condition of unseaworthiness may arise from any number of circumstances, including an insufficient number of men assigned to perform a shipboard task, or the existence of a defective condition, however temporary, on a physical part of a ship." *Ribitzki*, 111 F.3d at 664.  To establish a claim of unseaworthiness, where a defective condition rather than a deficient crew is at issue, the Ninth Circuit has held that a Plaintiff must establish: "(1) the warranty of seaworthiness extended to him and his duties; (2) his injury was caused by a piece of the ship's equipment or an appurtenant appliance; (3) the equipment used was not reasonably fit for its intended use; and (4) the unseaworthy condition proximately caused his injuries." *Id.* "Causation is established by showing that the unseaworthy condition was a substantial, factor in causing

United States District Court
For the Northern District of California

1  the injury." *Id.* at 665. "The shipowner's actual or constructive knowledge of an

2  unseaworthy condition is not essential to liability." *Id.* at 664.

3  **Were Plaintiff's Injuries Caused by Either Negligence or Unseaworthiness?**

4  **Expert Testimony: Witness Qualifications**

5     The Court in evaluating the parties' contentions as to the possible negligence of

6  Defendants in operating an unsafe winch or the unseaworthiness of the F/V Sea Clipper

7  looks first to the qualifications of the expert witnesses who offered opinions on the issue.

8     This Court evaluated the qualifications of Plaintiff's expert on winches, Mr. Vito

9  Giglio, as well as his methodology for evaluating the workings of the winch on the F/V Sea

10 Clipper. One complication is that the winch was replaced before Mr. Giglio ever had a

11 chance to see it. The boat was out at sea, so he couldn't examine the winch, and then it

12 was replaced. Plaintiff claims Defendants replaced the winch because it was defective.

13 Defendants deny this and say it was merely replaced by a newer, stronger, faster winch.

14    Whatever the reason, Mr. Giglio hypothesized what happened based mostly on what

15 Fechtig told him and on his own prior experience as a captain who operated winches.

16    In evaluating expert testimony on scientific or technical subjects, the Court at trial

17 must apply the specifics of Federal Rules of Evidence Rule 702 and attendant case law,

18 specifically the case of *Kumho Tire*, in which the U.S. Supreme Court explained the *flexible*

19 use of the *Daubert* factors in the non-scientific arena. a trial court should apply them on an

20 individualized basis, depending on the nature of the technology and the experience of the

21 expert:

22    In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125
      L.Ed.2d 469 (1993), this Court focused upon the admissibility of scientific expert
23    testimony. It pointed out that such testimony is admissible only if it is both relevant
      and reliable. And it held that the Federal Rules of Evidence "assign to the trial judge
24    the task of ensuring that an expert's testimony both rests on a reliable foundation
      and is relevant to the task at hand." Id., at 597, 113 S.Ct. 2786. The Court also
25    discussed certain more specific factors, such as testing, peer review, error rates,
      and "acceptability" in the relevant scientific community, some or all of which might
26    prove helpful in determining the reliability of a particular scientific "theory or
      technique." Id., at 593-594, 113 S.Ct. 2786.
27

28    This case requires us to decide how Daubert applies to the testimony of engineers
      and other experts who are not scientists. We conclude that Daubert's general
      holding- - setting forth the trial judge's general "gatekeeping" obligation-applies not

only to testimony based on "scientific" knowledge, but also to testimony based on "technical" and "other specialized" knowledge. See Fed. Rule Evid. 702. We also conclude that a trial court may consider one or more of the more specific factors that Daubert mentioned when doing so will help determine that testimony's reliability. But, as the Court stated in Daubert, the test of reliability is "flexible," and Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination.
*Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, *141-142 (1999)

The lower court in *Kumho Tire* had excluded an expert's testimony that a tire blowout which caused a fatal accident was due to a defect because it did not accept his scientific methodology or the way he applied it, and granted summary judgment for Defendants. The Court of Appeals for the Eleventh Circuit reversed the trial court, holding as a matter of law that the trial court had erred in applying *Daubert* to non-scientific testimony. The U.S. Supreme Court granted cert to address the following question:

in light of uncertainty among the lower courts about whether, or how, Daubert applies to expert testimony that might be characterized as based not upon "scientific" knowledge, but rather upon "technical" or "other specialized" knowledge.

*Id.* at 146-147.

The Court concluded that:

. . . Daubert's general principles apply to the expert matters described in Rule 702. The Rule, in respect to all such matters, "establishes a standard of evidentiary reliability." 509 U.S., at 590, 113 S.Ct. 2786. It "requires a valid ··· connection to the pertinent inquiry as a precondition to admissibility." Id., at 592, 113 S.Ct. 2786. And where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, see Part III, infra, the trial judge must determine whether the testimony has "a reliable basis in the knowledge and experience of the relevant discipline."

*Id.* at 149.

The *Daubert* factors may apply to the testimony of engineers and other experts who are not scientists and some of those factors may be helpful in evaluating the reliability even of experience-based expert testimony.  The Court of Appeals in *Kumho Tire* had erred insofar as it ruled those factors out in such cases. In determining whether particular expert

1  testimony is reliable, the trial court should consider the specific *Daubert* factors where they

2  are reasonable measures of reliability. *Id.*

3       The Court in the case at bar looks to the qualifications of the parties' experts with the

4  *Daubert* factors in mind, as delineated in *Kumho Tire* for application to non-scientific expert

5  testimony. Neither expert is a scientist but both have experience with the technology at

6  issue, hydraulic winches, and the application of that technology in the operation of

7  commercial fishing vessels. The Court may apply the factors to determine whether the

8  parties' experts have a reliable basis in their knowledge and experience of the relevant

9  disciplines, whether they be the proper operation of commercial fishing vessels or hydraulic

10 winches.

**Plaintiff's Expert**

13      Mr. Vito Giglio was at one time master of a vessel, the Sea Aker Husky, which used

14 winches to position mooring systems for oil rigs in the Gulf of Mexico. (Giglio, Excerpted

15 Proceedings Transcript ("EPT")(Admitted into evidence as Court Exhibit 1) 65:21-66:6) He

16 also served as master for twenty plus years on various tuna fishing vessels, which would

17 typically deploy a large net, which rolled aboard pulled by a power block on the boom, using

18 Gearmatics and other winches. He would usually be at the controls of the hydraulic

19 winches. Giglio EPT 68:7-70:2. The tuna fishing vessels he captained had nets with hook

20 lines. Giglio EPT 73:19-23.

21      Mr. Giglio had never testified in court as an expert, although he had served as a

22 non-testifying expert for Plaintiff's counsel on several other personal injury cases involving

23 fishing vessels. Giglio EPT 71:10-22.

24      For this trial he reviewed the depositions of Mr. Fechtig, Captain Gentry and Mr.

25 Warren Junes. He also reviewed some photos, the report of Mr. Walther and finally the

26 winch repair records. He reviewed the deposition of Mr. Junes after he prepared his own

27 Rule 26 report because it was not available earlier. Giglio EPT 82:2-24.

28

**United States District Court**
For the Northern District of California

1    This Court examines Mr. Giglio's expertise and experience to find whether they are

2    sufficient to qualify him as an expert and his testimony as reliable. *Kumho Tire,* 526 U.S. at

3    139.

4    The Court finds that Mr. Giglio has experience with winches, but only as a captain of

5    vessels that use winches. He testified that he had never on his own repaired a winch,

6    inspected a winch, or testified as an expert about a winch. His sole previous litigation

7    experience involving winches was his testimony in his own personal injury lawsuit for an

8    injury caused by a defective winch. Giglio EPT 97:1-3.

9    He did not have any experience with the particular fisheries in which the F/V Sea

10   Clipper engaged. Giglio EPT 80:14-16. He was a tuna fisherman, which is entirely different

11   from the bottom fishery. He used winches in the course of captaining tuna fishing vessels,

12   but did not claim to have repaired winches on his own or to have any specialized

13   experience with them. On direct examination he said that he assisted the chief engineer

14   with repairs, but conceded that, although he knew what the inside of a hydraulic winch

15   looked like, he "was no professional." Giglio EPT 79:15-20; 80:9-12.

16   Giglio never examined the particular winch which Plaintiff claims was the source of

17   his injury. Giglio EPT:84:4-8. This wasn't anyone's fault, but it reduces the reliability of his

18   testimony about whether the winch was defective or not. He also testified to phenomena

19   which other witnesses familiar with this particular winch said did not exist or which could not

20   have caused the circumstances which Plaintiff claims caused the accident.

21   For example, he described birdsnesting or backlashing as being caused by a defect

22   in the winch which causes the line to jerk. Giglio EPT 88:12-89:5 However, everyone else

23   with knowledge of winches and of the F/V Sea Clipper winch testified that birdsnesting

24   occurred only when the line was being let out, not when it was being pulled in. Plaintiff does

25   not contend that the line was being let out when he alleges he was jerked off his feet. He

26   concedes that it was being reeled in. The birdsnesting or backlashing which Mr. Gigio

27   identifies as the source of the jerk which allegedly pulled Plaintiff off his feet could only

28   have happened if the line were being let out. Mr. Giglio's theory is inconsistent with the

1    facts, both in terms of what causes a winch to jam and what happens when a line

2    birdsnests or backlashes.

3        When this Court applies the principles of *Daubert* and *Kumho Tire* to Mr. Giglio and

4    his testimony, the Court finds that in a jury trial, it might have excluded him as a witness.

5    However, in a bench trial, the Court merely adjusts the weight it gives to his testimony and

6    finds it less than substantial.

7        For these reasons this Court rejects his theoretical conclusions as to what

8    happened to cause Plaintiff's injury. The flaws in Mr. Giglio's testimony merely add to the

9    doubt cast on Plaintiff's version of events by the inconsistencies of Plaintiff's own versions

10   of those events.

11       In addition, Giglio's testimony and his conclusions about what happened with the

12   winch on the F/V Sea Clipper and how that might have caused Plaintiff's injury is directly

13   contradicted by the testimony of Defendants' expert, Mr. Walther, a marine engineer.

14                                    **Defendants' Expert**

15       Defendants' expert,  Charles Walther, graduated with a degree in marine

16   engineering, first in his class at California Maritime Academy. He worked for twenty-three

17   years for Crowley Maritime, ultimately as director of engineering, in charge of operating,

18   maintaining, overhauling and repairing hundreds of winches, many of them similar to that

19   on the F/V Sea Clipper. Walther TT 354:16; 355:24-356:9.

20       He sailed for several years as a chief engineer on Crowley Maritime's harbor and

21   ocean tugboats, in charge of all onboard machinery, including hydraulic equipment.

22       He received specialized training from marine component manufacturers in marine

23   diesel engines and a fluid power course on hydraulics. Walther TT 356:23-357:23.

24       He is an elected member of the Society of Marine Architects and Engineers. Walther

25   TT 357:25-358:1.

26       He is a member of a number of other boards and committees in the maritime

27   industry.

28

1    He left Crowley Maritime in 1989 and has since had his own consulting business,

2  offering technical advice for entities running tankers in Japan, the Blue and Gold Fleet in

3  San Francisco, Matson Line, the Alameda Ferry, and local governments' maritime agencies

4  on marine equipment maintenance, repair, engineering and troubleshooting. Walther TT

5  359:10-361:1.

6    He does expert forensic consulting and has qualified as an expert witness in

7  California State Court and in U.S. District Court and has previously worked for both the law

8  firms in this case. Walther TT 361:4-362:23.

9    To prepare his Rule 26 report for this case, Mr. Walther did the following:

10    He looked at the winch that came from the vessel.  He got some Braden Winch

11  Company information, Braden being the manufacturer that superseded the manufacturer of

12  the winch that was onboard. He interviewed Captain Mark Gentry.  He read the Plaintiff's

13  complaint, Plaintiff's response to Sea Pacific, the  Plaintiff's settlement conference

14  statement, Defendant Sea  Pacific's response to Plaintiff's interrogatories, Defendant Sea

15  Pacific's supplemental responses, Captain Mark Gentry's  deposition transcript, deckhand

16  Kent Mooreland's deposition transcript and Plaintiff Fechtig's deposition transcript. He

17  obtained Plaintiff's height and weight, 6 feet and 210 pounds at the time of the accident; he

18  did internet searches for the winches, hydraulics, wire ropes and hydraulic supply

19  company. He did some research with another expert named Curly Winebrenner, took

20  various photographs of the F/V Sea Clipper, corresponded with the winch representative

21  and reviewed Giglio's deposition and Warren Junes' deposition. Because Mr. Giglio's

22  deposition was not available until after he generated his Rule 26 report, he read it when it

23  was available, as was also the case with Mr. Junes' deposition.

24    He contacted the winch manufacturer, after obtaining the model name and serial

25  number from the winch, so he could identify the components.  He then did an Internet

26  search and contacted Paccar, which is now the owner of Gearmatic, to find out "what

27  information he could zero in on what that winch really is." He found that it was a Gearmatic

28  C2200 winch. He was then able to get some schematic diagrams of its internal workings.

United States District Court

For the Northern District of California

He obtained some from the Internet and some from Curly Winebrenner, whom he described as "the best hydraulic person that I've ever met or known. " Mr. Winebrenner has done work on hydraulics for large cranes and has a number of old books with schematic diagrams of winches. Walther TT 362:21-364:25.

### Testimony at Trial on Negligence and Seaworthiness

The Plaintiff and his expert, Vito Giglio, testified to several possible explanations for what might have caused the line to jerk and cause his fall.  The possible explanations included:

In an answer to interrogatories, Plaintiff claimed that the vessel should have had a platform on which Plaintiff could stand while hooking up the wire and block to the splitting strap on the net.  Fechtig's Response to Interrogatory No. 11, Ex. WW.  This theory was withdrawn at trial, when Plaintiff testified he was standing on the deck instead of the loaded fish net at the time of his accident  Fechtig TT 193:7-194:9, 336:18-341:22;

Plaintiff claimed that both before and after the accident, the wire jerked several times per day nearly every day during the hake fishing season.  Fechtig TT 168:11-171:6, and that the deckhands were instructed to keep pressure on the hook end of the wire as it was being let out off the winch  Fechtig TT 161:13-163:12.  According to Mr. Giglio, this might have caused the wire to "birdsnest" or become loose on the reel as it was let out to the point it became entangled, causing it to jerk. Alternatively, Mr. Giglio testified that the wire may have "overwrapped," or entangled as it was hauled in, causing it to "backlash" or reverse directions with a jerk  Giglio EPT 88:5-90:19.

The Plaintiff also testified that on one occasion during the hake season the winch froze, and the crew beat on it with a hammer to unsuccessfully try to free it up.  Fechtig TT 172:12-173:4.  Mr. Giglio wrote in his expert report that he did not believe this caused the accident, but testified that based on the testimony of Mr. Junes, the winch repairman, that a defect in the winch brake system may have caused the wire to jerk.  Giglio EPT 99:18-103:10.

United States District Court

For the Northern District of California

The Plaintiff and Mr. Giglio agreed that the accident must have occurred as the wire was being hauled in.  Giglio TT 462:23-463:19.  Mr. Giglio testified that, assuming Plaintiff's version of the accident was true, Captain Gentry must have activated the winch to haul in the wire without warning the Plaintiff, and that this could have caused Plaintiff to either be jerked up and backwards or simply lose his balance and fall.  Fechtig TT 92:21-93:23. The Plaintiff admitted that he does not know what caused the line to jerk, lift him in the air, and fall.  Fechtig TT 249:17-22.

The Defendant denied that an accident happened that day and explained why it couldn't have happened as Plaintiff claims.  The Defendant presented the testimony of Captain Mark Gentry, deckhand Kent Mooreland, winch repairman Warren Junes, and marine engineering expert Charles Walther to respond to Plaintiff and Mr. Giglio's liability theories.  Their testimony convinces the Court that the accident did not occur as Plaintiff claims because:

Although the Plaintiff testified on direct examination that he didn't know if anyone saw him fall,  Fechtig TT 197:22-198:23, he testified at deposition that he didn't report the accident that day because Captain Gentry and Mr. Mooreland saw him fall.  Fechtig TT 456:17-457:21.  Captain Gentry and Kent Mooreland testified, however, that they did not see Plaintiff fall, nor did he complain of hurting his shoulder until the next day.  Gentry TT 575:11-20; 587:7-18; 594:15-595:21; Mooreland DT 33:11-38:3.

Captain Gentry testified that he was supervising the operation and would have seen the Plaintiff fall had the accident happened as Plaintiff claims.  Gentry TT 586:6-587:6.  Mr. Mooreland testified that during this operation, his role was generally to observe the other deckhand and assist as necessary.  Mooreland DT 31:21-33:10. Captain Gentry and Mr. Mooreland further testified that there wasn't a problem with the wire repeatedly jerking during this operation, either before or after the accident.  Indeed, both denied that it ever happened.  Gentry TT 529:15-530:17; Mooreland DT 17:11-25:17.

United States District Court

For the Northern District of California

1   Captain Gentry further testified that there wasn't a problem with the wire

2   "birdsnesting" before or at the time of the accident.  Gentry TT 588:5-19.  He testified and

3   Mr. Walther confirmed that birdsnesting only happens when the wire is being let off the

4   winch, which would not have been the case had the accident happened as Plaintiff claims.

5   Gentry TT 588:5-19; Walther TT 383:12-384:8.  Birdsnesting also causes the net reel to

6   stop, which didn't happen.   Fechtig TT 193:7-195:18.  Mr. Walther further confirmed that

7   keeping tension on the "hook end of the wire" as it is let off the winch to prevent

8   birdsnesting is a normal practice in the marine industry.  Walther TT 384:19-385:8.

9   Captain Gentry also testified that there wasn't a problem with the wire

10  "overwrapping" before or after the accident.  Gentry TT 587:19-588:4.  Mr. Walther testified

11  that overwrapping occurs as a wire is hauled in on a winch, when the wire does not spool

12  evenly in perfect rows onto the winch.  Walther  TT 373:14-374:4.  He explained, however,

13  that overwrapping does not cause the wire to jerk either. Some overwrapping is normal

14  when the wire builds up at one end of the spool, but that this causes no more than a two to

15  five percent change in the wire speed, which wouldn't be perceived by a deckhand handling

16  it. Walther TT 374:5-375:19.  While a wire can overwrap so severely that it causes the

17  winch to stop, the crew would be required to burn the wire off or pull it free, which didn't

18  happen here.  Finally, while an overwrap could cause a line reversal, it would bend and

19  damage the wire, which didn't happen here either.  Walther TT 374:18-375:19; 384:9-18,

20  423:4-14 ; Giglio EPT 97:13-19.

21  Captain Gentry testified that the winch did not cause the wire to jerk.  On one

22  occasion during the season, the winch froze and had to be turned off.  When it was turned

23  back on, it worked again through the rest of that season and for another year later.  Gentry

24  TT 588:20-590:15.  Mr. Walther testified that this was likely due to dirt in the hydraulic

25  system release valve, which would divert hydraulic oil from the winch control and stop it

26  from moving.  After the system cooled and the release valve closed, the system operated

27  properly. Walther TT 395:6-396:21. Finally, Mr. Junes testified  and Mr. Walther confirmed

why a defect in the winch brake wouldn't cause the wire to jerk as Plaintiff claimed.  They both testified that the brake would only slip if there was a significant load on the hook end of the wire (thousands of pounds) and that the wire would slip aft, not pull the load forward. There was no load on the wire at the time of the alleged accident.  Junes  Deposition Transcript (hereinafter "DT") 25:13–27:22, admitted into evidence as Court Exhibit 2); Walther  TT 391:17-393:18.

Captain Gentry testified that he never activates a winch to haul in a wire without warning his crew, and that there would be no reason to haul in the wire according to Plaintiff's scenario anyway.  Gentry TT 586:6-17. The Plaintiff claims he was directed to take the hook end to the wire to a splitting strap forward of where he was standing.  Fechtig TT 192:5-15.  Captain Gentry testified that if that was the case, he wouldn't haul in the wire because it would take slack out, making it harder for Plaintiff to reach the next forward splitting strap.  Gentry TT 575:21-577:21.

Based on his inspection of the winch and confirmation from the manufacturer and other experts concerning its operational capacity, Mr. Walther testified that when the wire was double blocked, the wire could not move faster than 26 feet per minute, which could not cause a sudden jerk.  Walther  TT 397:1-399:4.  Captain Gentry confirmed the maximum speed of the line.  Gentry TT 549:6-19.

As the forward cod end of the net was pulled to the vessel's ramp, the weight of the fish in the net created tension on the empty net running from the ramp to the forward net reel, raising it off the deck.    Gentry TT 556:12-558:1.

The empty net immediately forward of the ramp was approximately six inches to two feet off the deck.  Gentry TT 571:6-11; 573:18-21.  The height of the net off the deck progressively increased to the point where the net was connected to the forward net reel, where it was approximately 7 feet off the deck.  Gentry TT 556:12-558:1; 573:18-574:8.

Captain Gentry further testified that if the Plaintiff had been jerked as claimed, he would have been pulled toward the center of the net where it is taut instead of falling into

United States District Court

For the Northern District of California

the one-foot gap between the edge of the net and the bin boards.  Gentry TT 566:14-567:13; 586:25-587:6. Neither could he have hit the next forward hammer lock as claimed because it was about twelve feet forward of where Plaintiff was standing.  Gentry TT 571:6-572:25.

The Plaintiff and Mr. Giglio admitted that it is not unusual for deckhands on commercial fishing vessels to slip and fall at times, particularly when handling lines, without any negligence on the part of the vessel owner or unseaworthiness of the vessel.  Fechtig EPT 116:5-9; Giglio EPT 95:23-96:12; Fechtig TT 350:16-21; 473:11-22.

### Findings of Fact on Negligence and Unseaworthiness

Given the foregoing, the Court finds that the Plaintiff and Mr. Giglio's testimony concerning the accident was not credible and does not establish either that the accident happened as Plaintiff claimed, that Defendants were negligent, or that the vessel was unseaworthy.  The Court finds that Captain Gentry, Mr. Mooreland, Mr. Junes and Mr. Walther were credible and adopts their testimony that the accident didn't happen and in fact couldn't have happened as claimed, and that the Defendant was not negligent and the vessel was not unseaworthy.  The Court finds that if the Plaintiff fell while working on the F/V Sea Clipper, it did not happen as he claims and was not due to the Defendant's negligence or the vessel's unseaworthiness.

### Plaintiff's Injuries

**Medical Treatment Following the Incident**

With respect to his alleged injuries, the Court finds that the Plaintiff had a history of long-term problems with his shoulder, neck and back prior to the alleged accident.

He was treated by Chiropractor Tracy Cole from February, 1996 through 1999, complaining of low back and shoulder problems he attributed to a series of auto accidents and the cumulative effects of his heavy labor.  He sought an award of disability benefits for this condition.  Cole DT (Transcript admitted into evidence as Court Exhibit 4) 9:16-10:25; 17:24-18:15; 24:13-25:24; 26:16-29:4.

United States District Court

For the Northern District of California

The Plaintiff's back and shoulder problems did not end in 1999.  He saw chiropractor Mark Henry for left shoulder complaints in 2001, and again in February, 2002 for pain in his "lower back, upper back, shoulders, neck, R. knee – long term injuries."  He complained that the pain in his back was "unbearable" when he fished.  Fechtig TT 486:22-490:6; Henry DT (Transcript admitted into evidence as Court Exhibit 3) 13:12-21, 44:9-47:1.

Captain Gentry confirmed that the Plaintiff worked just as hard, if not harder, after the alleged accident, as he did before it through the end of the hake season. He never complained of any pain in his back, neck or shoulders, or that he could not perform the work of a deckhand.   Gentry TT 597:19-598:16.  At the end of the hake season, the Plaintiff told Captain Gentry he wanted to take some time off with his family, but would return for bottom fishing.  Captain Gentry didn't hear from him again.   Gentry TT 598:17-25.

The Plaintiff continued to seek chiropractic treatment with Dr. Henry for his long term injuries after the alleged fall.  Fechtig TT 257:20-258:2.  Although Dr. Henry's practice and routine was to ask each patient whether he'd suffered any new accidents or injuries since his last visit, Plaintiff didn't mention this alleged accident until September 20, 2002, after he'd already seen Dr. Henry two times.  Henry DT 23:5-16, 26:3-33:14.

Dr. Thomas Sampson performed arthroscopic surgery on the Plaintiff's left shoulder on June 25, 2003.  However, the undisputed testimony of Leisa Halbohn and Danny Chavez, neighbors of Plaintiff's ex-wife and the testimony of Defendants' expert Dr. Victor Prieto provide very strong evidence that Plaintiff's complaints of pain were exaggerated, and the need for surgery was either unnecessary or related to long term wear and tear rather than the alleged accident.  Chavez TT 700:8-720:25; Halbohn TT 722:20-730:23; Prieto TT 820:4-827:5, 828:4-834:20, 835:22-836:2.  On October 21, 2003, Dr. Sampson found that the Plaintiff had no ratable disability and released him to full duty with no restrictions.   Sampson TT 37:11-21; 38:4-8; 53:6-56:15.  Dr. Victor Prieto confirmed that Plaintiff was able to return to commercial fishing. Prieto TT 832:15-833:25

The Court finds that after October 21, 2003, Plaintiff had no residual disability that prevented him from working as a deckhand in the commercial fishing trades.

### Additional Findings of Fact

Additionally, the Court notes that Plaintiff's testimony concerning his damages was not credible and confirms that his testimony about liability should be distrusted.  The Plaintiff testified that his low pre-accident earnings were due to his voluntary decision to not work because his wife earned a good salary and he wanted to spend time with his newborn son.  Fechtig TT 40:13-43:25, 46:4-20, 326:5-327:17.

He claimed that in 2002, he realized he needed to work more to support himself and his son, and he claims significant past and future wage loss.  However, the evidence showed that in reality he suffered from depression and other mental illnesses which impacted his ability to find stable work. Although he did work in the fishing trades before 2002, he proved to be unreliable, untrustworthy and easily frustrated.  The Plaintiff admitted that he quit the employ of several vessels because the situation "wasn't good" or was "too stressful."  Fechtig TT 332:15-335:8.

His back and shoulder problems were so significant that he sought California state disability in September, 1999,  Fechtig TT 480:16-483:25, and told chiropractor Henry in February, 2002 his back pain was "unbearable" when fishing. Henry DT 13:12-21, 44:9-47:1.

### Whether the Plaintiff was comparatively negligent

**Legal standard:**

"In maritime personal injury actions under the Jones Act ... courts have long applied the concept of comparative fault." *Pan-Alaska Fisheries, Inc. v. Marine Constr. & Design Co.*, 565 F.2d 1129, 1138 (9th Cir.1977). Contributory negligence is applicable to mitigate damages when a seaman is injured if "alternative courses of action are available to the injured party, and he chooses the unreasonable course." *DuBose v. Matson Nav. Co*, 403 F.2d 875 at 878 (9th Cir. 1968) (citing cases from the First, Second, Fourth and Fifth

United States District Court

For the Northern District of California

Circuits); *Socony-Vacuum Oil Co. v. Smith*, 305 U.S. 424, 432-33 (1939) (contributory negligence is proper if a seaman "knowingly failed to choose an available safe method of doing his or her work, "such as making use of a defective appliance knowing that a safe one is available").  Contributory negligence is measured by what a reasonable person would have done under similar circumstances. See *American President Lines, Ltd. v. Welch*, 377 F.2d 501, 504-05 (9th Cir.1967).  Courts apply the doctrine of comparative fault to encourage reasonable care by seamen while at the same time placing a high degree of responsibility on owners for the seaworthiness and safety of their vessels and appliances. *Socony*, 305 U.S. at 432-433.  The general rule permitting application of the doctrine of contributory negligence is well settled; however, there is an exception.  A seaman may not be held contributorily negligent for carrying out orders that result in injury, even if the seaman recognizes possible danger and does not delay to consider a safer alternative.

The Court finds that there was no substantial testimony presented at trial that Plaintiff either was or was not comparatively negligent.

### Plaintiff's Damages

This Court finds no liability of Defendants and therefore does not in detail evaluate Plaintiff's claim for damages. However, the Court makes the following findings:

Contrary to his claim that he didn't work much in 2000 because to wanted to spend time with his newborn son, he was jailed for 50 days after being convicted of violating a domestic violence restraining order.  Fechtig TT 327:8-332:13.

He admitted he quit three boats because of conflicts with the captains. Fechtig TT 332:15-335:8.

Ann Timmer, owner of the F/V Donita, confirmed that he quit working on her boat because he couldn't sleep, then filed a claim and threatened to sue her.  Timmer TT 232:3-237:21.

Although the Plaintiff claims he has been unable to return to work in commercial fishing, his testimony was refuted by Captain Roger Semanak and deckhand Randy

United States District Court

For the Northern District of California

Franck, who confirmed that Plaintiff took a job as a deckhand on a crab boat, quitting only because his girlfriend complained, then asked for his job back.  Franck TT 655:21-658:5; 674:18:681:4. Mr. Semenak appeared at trial via video deposition and his testimony was not reported, the transcript having been lodged with the Court. It was admitted into evidence as Court Exhibit 6). References are therefore to his deposition of November 9, 2005. Semanak DT 23:279-28:415, video of deposition at Ex. TTT.

The Court finds there is nothing in the Plaintiff's work history to suggest he was capable of or would have earned more than his prior historical earnings.

**Whether Defendants failed to promptly pay maintenance and cure to Plaintiff - Plaintiff appears to have abandoned this issue**

**Legal Standard:**

"Maintenance and cure is designed to provide a seaman with food and lodging when he becomes sick or injured in the ship's service; and it extends during the period when he is incapacitated to do a seaman's work and continues until he reaches maximum medical recovery." *Vaughan v. Atkinson*, 369 U.S. 527, 531 (1962).  A seaman who is entitled to receive maintenance and cure may recover "a living allowance during the recovery period (maintenance), reimbursement for medical expenses (cure), and unearned wages for the period from the onset of injury or illness until the end of the voyage.*"  Gardiner v. Sea-Land Service, Inc.*, 786 F.2d 943, 946 (9th Cir.1986).  The duty to provide maintenance and cure "does not rest upon negligence or culpability," and is not "restricted to those cases where the seaman's employment is the cause of the injury or illness." *Calmar S.S. Corp. v. Taylor*, 303 U.S. 525, 527 (1938).

Moreover, "if the seaman can establish that he had not in fact fully recovered, his return to work on another vessel does not terminate his right to maintenance and cure from the vessel in whose service he was injured or became ill." *Permanente S. S. Corp. v. Martinez*, 369 F.2d 297, 299 (9th Cir.1966).

United States District Court

For the Northern District of California

In the case at bar, Plaintiff does not dispute that Defendants began making payments to him as soon as they were notified of his claim and that Defendants made the payments negotiated by his former attorney, in addition to paying all his related medical expenses.

Plaintiff's former counsel Mr. Brodsky negotiated with Defendants and agreed to a rate of $33.00 per day for maintenance. London TT 753:1-15. There was some delay while arrangements were made to satisfy a tax lien by the State of California. London TT 754:21-756:2. The period covered by the first payment was July 15, 2002 to February 28, 2003, and payment was wired to Plaintiff's bank account within one week of the agreement with his attorney. London TT 756:22-757:9.

Plaintiff reached maximum cure according to Doctor Sampson on October 21, 2003. Defendants stopped making payments on December 15, 2003, in fact overpaying Plaintiff by $2000.00. London TT 759:8-760:7.

### CONCLUSIONS OF LAW

The Plaintiff has pled causes of action for Jones Act negligence and for general maritime law unseaworthiness, maintenance and cure, and the wrongful refusal to pay maintenance and cure.  The U.S. Constitution extends federal judicial powers to "all cases of admiralty and maritime jurisdiction."  U.S. Const. Art. III, § 2.  Section 9 of the Judiciary Act of 1789 implements this constitutional extension of judicial power to maritime cases. The controlling law is the maritime law of the United States.

The Jones Act, 46 U.S.C. section 688 *et seq.*, requires that the employer provide to its employees a reasonably safe place to work under the circumstances, but it does not require that the work area be absolutely safe.  *Bankston v. Ogden Marine, Inc.*, 843 F.2d 497 (5th Cir. 1988).

To recover damages for Jones Act negligence, a seaman must prove that his employer was negligent and that the negligence caused his injury. *Benoit v. Humble Oil*

United States District Court

For the Northern District of California

1   *and Refining Co.,* 368 F.2d 228 (5th Cir. 1966); *Litherland v. Petrolane Offshore Const.*

2   *Services*, *Inc.,* 546 F.2d 129 (5th Cir. 1977).

3

4                                    **Negligence**

5        To prove that his employer was negligent under the Jones Act, a seaman must

6   prove that he failed to use such care as a reasonable employer would have under like

7   circumstances.  *Ribitski v. Canmar Reading & Bates, Ltd.*, 111 F.3d 658 (9th Cir. 1997);

8   *Gautreaux v. Scurlock Marine, Inc.,* 107 F.3d 331 (5th Cir. 1997) See Ninth Circuit Manual

9   of Model Jury Instructions Civil, No. 9.3.

10       A vessel owner will not be held liable if a job could have been performed with

11  reasonable safety, but the Plaintiff was injured because he did it in an unsafe manner.

12  *Debose v. MS Loppersum,* 438 F.2d 642, 642-643 (5th Cir. 1971); *American Seafoods v.*

13  *Nowak*, 2002 U.S. Dist. Lexis 20255 (W.D. Wa., 2002).

14       Applying these standards, the Court finds that Defendants were not negligent.  The

15  Plaintiff has failed to prove, indeed there is no credible evidence, that Captain Gentry or the

16  vessel owner failed to use reasonable care in the ownership, maintenance or operation of

17  the vessel.  The Court finds that if the Plaintiff was injured on the vessel, it did not occur as

18  he claimed and was likely due to a shipboard fall which occurred without any negligence on

19  the part of the vessel owner or captain.

20

21                                  **Seaworthiness**

22       Under the general maritime law, a vessel owner has a non-delegable duty to provide

23  and maintain a seaworthy vessel.  *Mitchell v. Trawler Racer*, 362 U.S. 539 (1960).

24       The vessel owner is not, however, an insurer of the safety of its seaman, nor is it

25  required to provide a vessel that is accident free.  *Phipps v. N.V. Nederlandsche*

26  *Amerikaansche Stoomvart, Maats,* 259 F. 2d 143 (9th Cir. 1958).  Perfection is not required

27  and the mere fact of an accident does not establish unseaworthiness.  *Smith v. American*

28

United States District Court

For the Northern District of California

*Mail Line, Ltd.*, 525 F.2d 1148 (9th Cir. 1975); Rice v. Atlantic Gulf & Pacific Co., 484 F. 2d 1318 (2d Cir. 1973); *Mosley v. Cia Marit. Adra. S.A.*, 314 F. 2d 223 (2d Cir. 1963).

To establish unseaworthiness, a seaman must prove that a vessel or its parts and equipment are not reasonably fit for their intended purpose, and that the unseaworthiness played a substantial part in bringing about injury or damage and is operated by a crew reasonably adequate and competent for the work assigned.  *Mahnich v. Southern S.S. Co.*, 321 U.S. 96 (1944), Ninth Circuit Manual of Model Instructions Civil No. 9.7.

The test of reasonable fitness is determined by the "reasonable man" standard. *Gautreaux v. Scurlock Marine, Inc.* 107 F.3d 331, 339 (5th Cir. 1997).

In determining whether a vessel is seaworthy, the trier of fact must consider that the rigors of a seaman's life are unlike those of land-side workers.  Some danger is to be expected and does not necessarily constitute unseaworthiness.  *Colon v. Trinidad Corp.*, 188 F.Supp. 97 (S.D.N.Y. 1960).

Applying these standards, the Court finds that the F/V Sea Clipper was not unseaworthy.  If the Plaintiff was injured on the vessel, it did not occur as he claimed and was likely due to something other than any unseaworthy condition of the vessel.

**Maintenance and Cure**

"Maintenance" refers to the daily subsistence allowance for quarters and meals an injured or sick maritime employee is entitled to receive.  *See generally Sana v. Hawaiian Cruises, Ltd.,* 181 F.3d 1041 (9th Cir. 1999).

The seaman is entitled to this benefit to the point he reaches "maximum cure."  See Id.  The parties may agree to rates of maintenance.  *See Gardiner v. Sea-Land Service, Inc.*, 786 F.2d 943 (9th Cir. 1986).

The Court finds that the Defendants paid the full rate of maintenance until the Plaintiff reached maximum cure and did so in a timely manner after notification of Plaintiff's claim.  Plaintiff is therefore not entitled to damages or attorneys fees for the Defendants' alleged willful refusal to pay maintenance.

**United States District Court**

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Conclusion and Order**

Given that the Plaintiff has failed to meet his burden of proof as to any of his causes of action, judgment shall be entered in favor of the Defendants and against the Plaintiff as to all causes of action.

IT IS SO ORDERED.

DATED: October 17,  2006

_____
James Larson
Chief Magistrate Judge

G:\JLALL\CHAMBERS\CASES\CIVIL\03-4056\Findings-Final.wpd